YARRUT, Judge.
This appeal involves the question whether an immovable acquired by the deceased wife (Effie Pecot Marshall) during her marriage, was acquired with her separate earnings while living separate and apart from her husband, before she obtained a divorce from him.
The contest is between a sister and sole testamentary heir and legatee of the deceased (appellant), and the surviving ex-husband, Joseph Marshall (appellee). The latter’s claim that the property belonged to the community existing between him and the deceased was allowed by the district court
There are certain facts which are not in dispute to wit: The parties were married in January, 1918. On March 9, 1937, the wife acquired the immovable in New Orleans, bearing Municipal No. 5100 Camp Street, for a stated cash consideration of $3,300. The notarial act of sale recites that the wife was married but once, to Joseph Marshall, from whom she was then living separate and apart for the past eight years; and that she was acquiring the property with her separate and paraphernal funds, under her own separate administration and control.
On January 18, 1938, the wife filed suit for an absolute divorce against her husband alleging she and her husband had been living separate and apart since November of 1929 (or nine years). Marshall did not contest the suit, and judgment was rendered against him by default on March 16, 1938, granting the wife an absolute divorce.
On November 5, 1948, in the same divorce proceeding, she brought suit to have the Camp Street property declared separate and paraphernal. Marshall answered, alleging that he and his wife had lived together up until the time of the divorce, and contended the property was purchased with community funds and should be declared community property. After ten years, Marshall had the suit dismissed for want of prosecution.
The wife, who had never remarried, died November 11, 1962, and left a will making her sister (appellant here) sole heir and universal legatee.
The district judge rendered judgment declaring the immovable to be community property.
The law applicable here is that all property acquired during the marriage is presumed to be community unless it was inherited, the subject of a donation, acquired by the wife with her earnings while living separate and apart from her husband, or with funds awarded her as damages from offenses or quasi offenses. LSA-C.C. arts. 2334, 2402, 2405.
The evidence is conclusive that the funds used by the wife in the purchase were derived from her wages earned while continuously employed as a nurse and housemaid for several families, while living separate and apart from her husband and that, with the exception of one night a week, she lived at the residence of her employers. She began her domestic work in 1918, the very year of her marriage to Joseph Marshall. For five or six years thereafter her husband lived with her at the residences of her various employers. Because of a rift in their relationship in 1923, the wife demanded that he leave, and she lived separate and apart from him, although he gave the incredible testimony that she “sneaked” out of her employer’s home late at night to spend the night with him, but returned to her employer’s home about 5 :30 the next morning, in effect charging she had abandoned the young children of her employers who were left in her charge. This, one of her employers refuted. Another of her employers (C. Alvin Bertel) testified it was necessary for him to intervene to prevent Joseph Marshall from molesting his wife.
While deceased and her husband were living separate and apart (at least from 1929 to the date of her death), she was earning her own living and supporting her *236 self, and spent her leisure nights with Rita Joseph who rented a room to her at 2908 Jena Street where Rita and Rita’s sister, Virginia (her next-door neighbor), visited and accompanied her to the neighborhood movies and church affairs. Virginia testified the wife would have nothing to do with her husband during this time, and was not living with him.
Around 1930 she went to work for Mr. and Mrs. Meric as a nurse for their two young children. She lived on the second floor, near the children, to care for them during the night because Mrs. Meric was frequently ill and could not be disturbed. Mr. Meric testified she had only one night a week off, and if she went out any other night, which was very rare, she would return to be with the children during the night. She continued to work for the Meries from approximately 1930 until 1954 or 1955. This clearly destroys Marshall’s testimony that she frequently “sneaked” out at night to be with him and returned to her employers before dawn.
In her suit for divorce, he permitted the judgment to go by default, despite the fact that he was employed at that time by a prominent attorney (Johnson Armstrong) and knew several other attorneys.
Her employers testified that they furnished her meals and sleeping quarters on the premises, as well as her clothing. Because of her free meals, lodging and clothes, and generous “tips” she was able to save a considerable portion of her earnings, as disclosed by her bank account, which shows that, on the day before her • acquisition of the property, she withdrew $1,500. Paul Williams, her boy-friend, testified that he was with her when she withdrew the money for the purchase price.
From the time of her purchase of the property in 1937, she maintained absolute, uncontested possession, control and ownership of the property. Though her divorced husband had every opportunity to challenge her suit from 1948 to 1958, it was not until after her death that he took affirmative legal action in her succession to claim the property was community property, after she was silenced by death.
Joseph Marshall’s other testimony is interesting. He testified he rented rooms and made $100 a week doing so; he was subsequently arrested for renting rooms for prostitution, had been “picked up in a raid, like that,” picked up in 1932 for no visible means of support, picked up in 1919 for larceny, and he was a gambling man, that is, he “ran a game.”
Though he testified he gave his wife the money to buy the property, he offered no explanation why she was permitted to purchase it as her separate property, and keep possession and control exclusively for 25 years. When questioned by the court, he said the reason he never made claim against her for the property was because she threatened suicide if he did. This fails to explain why Paul Williams had to accompany her to the bank to get the money and also to attend the act of sale; nor does it explain why her husband was not present, if he gave her the purchase money.
Though Marshall claims he gave her the purchase price for the property in 1937, he gave this pertinent testimony:
“A. She left me in ’37. We was to move in the house in ’38.
“Q. And you separated from her in 1937 until the time she died? You never went back to her?
“A. I didn’t what?
“Q. You didn’t go back and remarry?
“A. No, sir.
“Q. And during all that time she lived in this property on Camp Street?
“A. She lived in that property.”
Melba Williams, the only witness called by Marshall, was either mistaken as to the identity of the wife or for some other rea *237 son did not tell the truth, when she described her as “kind of short * * * on the stout side.” Others described her:
“She was not very heavy.” (Testimony of Paul Williams, p. 99, Exhibits Bertel 1 and Bertel 2.)
“She was tall and fairly slender; on the slender side.” (Testimony p. 56, Jean Kuhn.)
“She was never heavy. She was never fat.” (Testimony p. 72, Lizzie Johnson, Effie’s sister.)
The evidence clearly proves that the deceased and Joseph Marshall separated in 1929, and lived separate and apart continuously without reconciliation from 1929 until her death in 1962.
One of the bank accounts which deceased maintained in her own name discloses regular deposits over a long period of various amounts of $40, $30, $25, $10, etc. It was testified that during the depression of 1933 she withdrew her account from another bank which later was closed and liquidated, and deposited it in the Whitney Bank in New Orleans which, on April 28, 1933, records an initial deposit of $2,000 and subsequent deposits every two months in varying amounts. On March 8, 1937, the day before she purchased the property, when she withdrew $1,500 from the Whitney Bank, she left a balance of $867.46. Thereafter, she continued to make deposits in various ■small sums at various intervals. The record of the bank from which she withdrew her money in fear of the depression, was not produced, evidently because the bank was judicially liquidated and its records no longer available. We can only conjecture this bank book was destroyed by the wife long before her death, under the belief it had no further use.
When the wife brought suit to have the property declared separate and paraphernal, Marshall had an opportunity to try the issue. Instead, he had her suit dismissed aft■er ten years for want of prosecution. At no time did he seek a settlement of the community when the status of the property would have been at issue; and did nothing from November 5, 1948, when deceased first raised the issue, until after her death, November 11, 1962, a period of fourteen years.
 As a general rule, the wife has the burden to overcome the presumption of community, and the evidence must be strong, clear and convincing. Fleury v. Fleury, 131 So.2d 355; Succession of Blades, La.App., 127 So.2d 263; Magnolia Petroleum Co. v. Crigler, La.App., 12 So.2d 511.
The evidence, the recital in the act of sale, the basis of the judgment of divorce by default, and the fact that the wife was working and earning money regularly with practically no living expenses, and her bank account showing her regular deposits; and the husband’s failure to challenge the wife’s separate and paraphernal purchase until fourteen years from the time she raised the issue, which was after her death, is convincing that he knew what the real truth was.
Further, the testimony shows the deceased lived in the property as the common-law wife of Paul Williams from 1939 until her death in 1962; yet Marshall did nothing to terminate his furnishing half of their home. His only answer, when questioned as to whether the deceased lived with Marshall, was:
“It was her place — she wasn’t exactly there, but she would come there every time she was off. It was her place.”
When Marshall was cross-questioned on this point, he testified:
“Q This house that is now in controversy in this suit, this house that you brought suit to get a part of, Effie and Paul Williams lived together in that house as husband and wife, isn’t that correct?
*238 “A Well, she told me that was her roomer; she told me his room was in the hack upstairs and he was supposed to he a roomer; that’s all I knew about that I talked to him myself at that time and he hold me that he roomed up there. I saw him several times up there on Pitt Street at Mrs. Nunez’s house. He was down there doing some work, and she made me quit it with him, but I didn’t know he was the same one living with her as husband and wife.”
While no plea of res adjudicata was filed in the district court or herein, under LSA-C.C.P. arts. 927 and 2163, concerning the fact of their living separate and apart, we think it sufficient alone to hold that the judgment of divorce on the ground that the wife had been living separate and apart for at least nine years prior to the filing of the divorce suit, shifted the burden of proof to the husband to nullify such fact here. It would be a non sequitur to hold that the test of what constitutes living separate and apart, as the basis for a divorce, is different when determining the status of property acquired by the wife during that period. See Succession of Le Jeune, 221 La. 437, 59 So.2d 446.
There is no evidence that the deceased wife ever demanded or received alimony or support from her divorced husband, presumably because she was always self-supporting.
We must conclude that the presumption of community has been met and overcome by the appellant, and that the judgment of the district court, decreeing the immovable to be community property, must be reversed; but in all other respects is affirmed; all costs in both courts to be assessed against Joseph Marshall.
Judgment reversed in part and affirmed in part